OTTO PEESEL, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (H & H Sand and Gravel, Appellee).

First District (Industrial Commission Division)   No. 1—91—0047WC

Opinion filed January 10, 1992.

■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■

Mark E. Wohlberg, of Chicago, for appellant.

August M. Mangoni, Ltd., of Chicago (August M. Mangoni and Louis G. Atsaves, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Otto Peesel, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.1 *et seq.*) for an injury which allegedly arose out of and in the course of his employment with respondent H & H Sand and Gravel on January 22, 1988. Following a hearing held on December 13, 1988, the arbitrator found that no employer-employee relationship existed between respondent and claimant on January 22, 1988. As a result of the finding, all remaining issues were decided against claimant. Without hearing further evidence, the Industrial Commission (Commission) adopted the arbitrator's decision in its entirety. The circuit court confirmed the Commission's decision. This appeal followed.

For purposes of this appeal, the sole issue raised by claimant is whether the Commission's determination that no employer-employee relationship existed was against the manifest weight of the evidence.

At the arbitration hearing, claimant testified that he was 57 years old and had been driving trucks for 43 years. Using his own dump truck, he had hauled dirt, sand, crushed rock and gravel for respondent for about 10 years prior to the subject injury. On September 30, 1986, the parties signed a three-year equipment lease. The lease named as lessor "Peesel Motor Service" of Clarendon Hills, Illinois, and as lessee "H & H Sand and Gravel Haulers Company, Inc." The lease was signed by claimant on behalf of lessee as "owner/operator," and John Pasquesi, respondent's vice-president, signed on behalf of lessor. Under the lease's terms, claimant provided the tractor and trailer. The agreement also provided that respondent was to secure all insurance required by the Illinois Commerce Commission (ICC) in its name. In fact, claimant paid the truck's insurance premiums. Further, the lease stated that "LESSEE [respondent] shall be responsible for supervision and control of all operations under this lease." Claimant's

compensation was to be 86% of the gross revenue, with respondent getting the remaining 14%.

Respondent billed the customers based on the loads that claimant hauled. The percentage paid to claimant was based upon the gross amount of the billings. The billings were based upon the weight of the load hauled by claimant, and claimant was paid his percentage of the gross billings based upon the weights that he hauled. Payments would be made weekly from respondent to claimant and not after every load hauled.

Claimant paid for fuel and maintenance of the truck, as well as for the necessary fees and licenses. He filed the required annual reports with the ICC in 1986 and 1987 under the name of Peesel Motor Service. These filings indicate that claimant was the sole owner and operator of the dump truck. While driving under the subject lease, claimant displayed ICC permit numbers issued to him as owner-operator and to respondent. Claimant testified that when he drove for respondent he applied a magnetic H & H sign to the truck's door. Respondent entered into evidence an undated picture in which the subject dump truck displayed a door sign reading "Peesel Motor Service."

Claimant was paid by respondent on a weekly basis. Entered into evidence was a document entitled "Report of Employee's Wages for period of ____ weeks ____ days." The document lists the weekly payments made to claimant by respondent for all of 1987 and the first three weeks of 1988. It refers to the former as "employee" and the latter as "employer" and is signed thusly:

"Marion P. Remark Employer

By H & H Sand and Gravel Hauling"

Claimant earned $49,717.17 in 1987 and hauled for no other company during that portion of the leasing period. Claimant's 1987 expenses related to the operation of his truck amounted to $38,826. Respondent deducted 2% of claimant's gross revenue to pay for workers' compensation insurance, even though said deduction was not described in the lease.

Claimant received the "1099" tax form for the 1987 tax year from respondent. The payer on the form was listed as "H & H Sand and Gravel," and the payee was listed as "Peesel Motor Service." No withholding of taxes appears on the 1099 form. Claimant did not receive a W-2 form from respondent. Claimant used the 1099 form in filing his income tax returns; he paid his personal income taxes and paid his own social security taxes.

Claimant called respondent's dispatcher in the evening before each work day and received his assignments for the following day. Claimant's work day often began at 5 a.m. and ended about 3 or 4 p.m. Respondent required that he report for work no later than 7 a.m. Claimant usually hauled five or six loads a day and on occasion as many as 8 to 10 loads.

At the time of the subject incident, claimant lived in Lemont, Illinois, on land owned by the Metropolitan Sanitary District and leased to respondent. He lived rent free on the premises in exchange for keeping "an eye on the place" at night and over weekends. A scale house was situated on the property. Before delivering any load of material, claimant's dump truck was weighed on this scale.

On Friday, January 22, 1988, claimant began hauling materials at 6 a.m. By 2 p.m., he had delivered three loads of crushed stone to a site in Evergreen Park, returning each time with a load of dirt to dump at a landfill near Lemont. Claimant testified that at 2:15 p.m. the outside temperature was between 20 and 25 degrees Fahrenheit. At that time claimant had returned to the yard and determined that he needed to clean out the frozen dirt, which had adhered to the bottom of the dump truck. Both the ICC and respondent required that the dump truck body be cleaned out of materials remaining in the truck after a completed delivery. Using a spade designed for such a task, claimant dislodged and cleared out approximately four cubic yards of frozen dirt.

After approximately 30 minutes of this activity, claimant felt a "terrific pain" across his arms and in his chest. With difficulty he climbed out of the dumper and went to his home which, as noted above, was located on the premises. He did not make any further runs that day. Over the weekend he rested; the chest pain diminished somewhat. The following Monday morning he contacted respondent's office to request permission to take the truck in for repairs at a garage. Respondent's dispatcher gave him permission to do so. Claimant lay down in the garage's waiting room throughout the repair, which lasted three hours. The tightness in his chest continued. After returning home, he talked to vice-president John Pasquesi and asked for some time off to which Mr. Pasquesi agreed. As of the arbitration hearing, claimant had not returned to work.

Claimant then saw his physician, Dr. Butcher, who performed a cardiogram on him. This test indicated substantial heart malfunction. Dr. Butcher thereafter admitted claimant to Hinsdale Hospital. Several days later, claimant was transferred to University of Chicago

Hospital, where he was hospitalized for approximately eight days. Heart medications alleviated some of claimant's chest pain.

While hospitalized, claimant informed Mr. Pasquesi by telephone of his heart problems. He related to Mr. Pasquesi that the various tests performed on him showed a "heart attack." After he was discharged from the hospital, claimant again talked with Mr. Pasquesi by telephone. At arbitration, claimant described the crux of the phone call.

"A. I told him I wouldn't be back and I asked him how Workmen's Comp was going to cover me and he said I was covered and I shouldn't worry about anything and I left it at that. I just kept sending the bills—I asked him if I could send the bills into [sic] him and he told me yes, go ahead and send them into [sic] him and I sent them into [sic] him as I received them."

Claimant talked once more with Mr. Pasquesi, who again assured him that he was covered under respondent's workers' compensation insurance policy. Claimant later talked with an employee of Casualty Insurance, who indicated that he was not covered by respondent's workers' compensation policy.

Respondent presented no testimony as to claimant's employment status. In reaching the conclusion that claimant was not respondent's employee, the arbitrator made the following findings:

"Evidence presented shows that Petitioner was an independent contractor doing business as 'Peesel Motor Service' for the years of 1986, 1987 and 1988.

Petitioner was the owner of a tractor and trailer which was leased to Respondent, and which bore the name of 'Peesel Motor Service', that the lease agreement provided that Petitioner would receive 86% of the gross revenues for the service, with Respondent to receive 14%, that Petitioner was responsible solely for his own insurance, maintenance of his own tractor and trailer, that Petitioner was given a 1099 tax form at the end of the year by Respondent for his services, that Respondent did not withhold any Social Security taxes, Federal, State or local taxes from Petitioner, that Petitioner filed his own tax returns as an independent contractor.

Petitioner filed with the Illinois Commerce Commission (Rx1 & Rx2) annual reports which set forth the facts that Petitioner was the sole owner and operator of his tractor and trailer, what his gross revenue was in the operation of his own trucking business, and from that amount he deducted his own business operational expenses, fuel costs and maintenance costs and re-

pairs, leaving him with a net income from the operation of his business of $7,428.00; that Petitioner testified that he reported said amount on his Federal Income Tax returns as owner of his own independent business, known as Otto Peesel d/b/a Peesel Motor Service.

\* \* \*

Based upon the above, this Arbitrator finds that Petitioner was an independent contractor and that Petitioner failed to prove that an employee and employer relationship existed between the parties on January 22, 1988."

As stated above, the Commission adopted the arbitrator's decision.

■ Various courts have noted that the determination of whether a claimant is an independent contractor or an employee is often a difficult task. The Commission's decision as to claimant's employment status will not be reversed unless it is against the manifest weight of the evidence. (*Kirkwood v. Industrial Comm'n* (1981), 84 Ill. 2d 14.) No one factor determines this issue, but several are considered prominent. Among them are the right to control the manner in which the work is done, the right to discharge, the nature of claimant's work as it relates to the employer's business, and who provides the tools, material or equipment. (*Wenholdt v. Industrial Comm'n* (1983), 95 Ill. 2d 76.) Of these factors, the right to control the work is the single most important factor in determining the parties' relationship. (*Wenholdt*, 95 Ill. 2d at 81.) Of growing importance is the nature of claimant's work in relationship to the employer's business. *Ragler Motor Sales v. Industrial Comm'n* (1982), 93 Ill. 2d 66.

We initially note that the arbitrator's decision did not address the majority of these factors. Rather it focused on claimant's ownership of the tractor and trailer, his filings with the ICC and statements made on his income tax returns.

■ A review of the evidence as related to the determinative factors indicates the following. There is no dispute that claimant owned and operated the subject dump truck, and he paid the fuel and maintenance charges, as well as all fees. As to which party controlled the manner in which the work is performed, claimant testified that respondent instructed him where he picked and delivered loads of material. Respondent required him to start work no later than 7 a.m. If respondent made a specific request in regard to a particular hauling assignment, claimant would follow it. Respondent offered no evidence to rebut this testimony. Moreover, claimant did not provide customers for respondent nor did he drive for any other company during the pendency of the subject lease.

The equipment lease signed by the parties supports claimant's testimony. (See *Wenholdt v. Industrial Comm'n* (1983), 95 Ill. 2d 76, 80 (a contractor's agreement is a factor to consider in determining a party's status).) The lease specifically states that the respondent was responsible for supervision and control of all operations under this lease. The lease defines "LESSEE" (respondent) as "the carrier under whose authority the equipment will be operated." The lease also contains the following paragraph: "REPRESENTATIONS OF PARTIES. Lessor represents that it is the owner of the equipment and has authority to enter into this lease; that it gives the equipment over to the exclusive use, direction and control of LESSEE during periods when the equipment is operated by or for Lessee."

As to the right to discharge, claimant's unrebutted testimony demonstrated that respondent could discharge him for any reason at any time. The lease agreement, unlike that found in the similar case of *Earley v. Industrial Comm'n* (1990), 197 Ill. App. 3d 309, discussed *infra*, contains no clauses describing by what mechanisms the leasing agreement could be terminated by one or both parties.

The evidence shows the relationship of claimant's work to respondent's business; the work claimant performed was an essential element of respondent's business. Respondent supplied materials such as sand, dirt and gravel to customers. Claimant's transportation of same provided a necessary link in respondent's business operations and, therefore, cannot be viewed in any way as separate and apart from them. From this evidence it is apparent that claimant's work for respondent falls within the presumption described by our supreme court in *Ragler Motor Sales v. Industrial Comm'n* (1982), 93 Ill. 2d 66.

> "Moreover, because the theory of workmen's compensation legislation is that the cost of industrial accidents should be borne by the consumer as a part of the cost of the product, this court has held that a worker whose services form a regular part of the cost of the product, and whose work does not constitute a separate business which allows a distinct channel through which the cost of an accident may flow, is presumptively within the area of intended protection of the compensation act. Thus, this court has recently attributed increased significance to the nature of the work performed in relation to the general business of the employer." 93 Ill. 2d at 71.

Also of importance is claimant's testimony that, on three occasions following his hospitalization, John Pasquesi assured him that he was covered under respondent's workers' compensation insurance pol-

icy. Mr. Pasquesi also told claimant to send him all medical bills arising from the subject occurrence. Such testimony indicates that respondent viewed the relationship as one of employer-employee. Significantly, respondent made no effort to rebut this portion of claimant's testimony. Additionally, the weekly payment schedule completed by respondent referred to claimant as "employee" and respondent as "employer." Said document was signed by an official of respondent as "employer."

In contrast, the factors cited by the arbitrator as to whether an employer-employee relationship existed with the exception of claimant's providing the equipment are not those given substantial weight in the determination of this issue. There is no dispute that respondent did not withhold any taxes from claimant's weekly paychecks, but this factor is not controlling. (See *Ragler Motor Sales v. Industrial Comm'n* (1982), 93 Ill. 2d 66.) Further, we are not aware of any authority that makes a claimant's annual filing with the ICC a critical factor in determining claimant's employment status.

Also, the fact that respondent deducted 2% of claimant's gross revenues to pay for the latter's workers' compensation insurance has been found to be no more than a weak indication that claimant was an independent contractor. *Earley v. Industrial Comm'n* (1990), 197 Ill. App. 3d 309, 318.

Respondent relies heavily on *Earley v. Industrial Comm'n* (1990), 197 Ill. App. 3d 309, which we find is distinguishable in several important aspects from the appeal at bar. In *Earley*, the claimant, Larry Earley, was an interstate trucker who signed a one-year equipment lease with respondent, Crown Transport, Inc. (Crown). Earley did not haul exclusively for Crown. He was permitted to do "trip leases" (hauling shipments for other carriers) on his own. Earley could, with Crown's permission, hire other drivers to make deliveries. If he needed help unloading a shipment upon delivery, Earley had to hire and pay someone to do so. The *Earley* court found it significant that Earley chose his own routes to and from interstate destinations.

In contrast, the instant claimant had a long-term relationship with respondent, culminating in a three-year lease signed in 1986. Claimant drove exclusively for respondent and hired no one to help him. Claimant drove only in the Chicago metropolitan area, which dilutes the fact that he chose his own routes to make deliveries.

Further, the lease agreement signed by Earley and Crown distinguishes *Earley* from the instant appeal. First, the *Earley* equipment lease included a clause which provided that said agreement could be terminated by either party for any reason upon the giving of 30 days'

notice. Other clauses in the lease stated that the lease could be terminated immediately by either party if there was a substantial breach of the lease agreement and that respondent could immediately terminate the lease agreement for substantial or repeated violations of governmental regulations. The *Earley* court found that this evidence gave a weak indication of claimant's status as an employee. Here, the lease is silent as to the agreement's termination. Claimant's unrebutted testimony was that respondent could fire him at any time for any reason. Thus, the appeal at bar diverges substantially from *Earley* regarding the right to discharge.

Further, the *Earley* agreement specifically refers to Earley as an independent contractor in several instances. This factor was significant in this court's determination that Earley was an independent contractor and not an employee. Contrarily, there is nothing in the subject lease agreement describing claimant as an independent contractor. Also, claimant testified that respondent's vice-president assured him that he was covered by its workers' compensation insurance, and he stated that all claimant's medical bills were sent to respondent. Further, the weekly pay schedule completed by respondent refers to the parties as employer and employee.

Thus, in critical considerations, namely, the right to control the work performed, the right to discharge, and the parties' express description of the relationship, *Earley* is distinguishable from the appeal at bar. Consequently, we find that it is not controlling in the appeal before us.

For reasons stated above, we reverse the circuit court's confirmation of the Commission's decision, which we find to be against the manifest weight of the evidence. We remand this cause to the Commission for determination of all remaining issues.

Reversed and remanded.

McCULLOUGH, P.J., and LEWIS, STOUDER and RAKOWSKI, JJ., concur.